## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BLUEFIELD DIVISION

| | | |
|---|---|---|
| **DOUGLAS W. HARGRO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 1:09-00019** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security denying Plaintiff's application for Disability Insurance Benefits (DIB), under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. This case is presently pending before the Court on Plaintiff's Motion for Summary Judgment (Document No. 11.) and Defendant's Motion for Judgment on the Pleadings. (Document No. 16.) Both parties have consented in writing to a decision by the United States Magistrate Judge. (Document Nos. 3 and 4.)

The Plaintiff, Douglas W. Hargro (hereinafter referred to as "Claimant"), filed an application for DIB on May 2, 2006 (protective filing date), alleging disability as of August 7, 1997, due to a back injury, the use of a back brace, asthma, nerve damage to back and legs, the use of a cane, knee injury, use of knee braces, mood disorder, depression, and right hand paralysis, all of which impairments resulted from an injury incurred while in the United States Army.[1] (Tr. at 17, 145-50, 167, 177-78.)

---

[1] Claimant filed previous applications for DIB on December 1, 1998, alleging disability as of August 3, 1997. (Tr. at 17, 151-54.) The claims were denied initially and on reconsideration. (Tr. at 17, 66-68, 73-75.) On February 10, 2001, Claimant requested a hearing before an Administrative Law Judge. (Tr. at 17.) The case was dismissed by ALJ King on May 25, 2001, due to abandonment, and no further action was taken. (Tr. at 17.)

The claim was denied initially and on reconsideration. (Tr. at 57-59, 61-63.) On August 23, 2006, Claimant requested a hearing before an Administrative Law Judge (Tr. at 55-56). (Tr. at 85.) The hearing was held on March 7, 2007, before the Honorable R. Neely Owen. (Tr. at 663-701.) By decision dated April 27, 2007, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 17-35.) The ALJ's decision became the final decision of the Commissioner on November 24, 2008, when the Appeals Council denied Claimant's request for review. (Tr. at 8-11.) On January 12, 2009, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 1.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2007). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e),

2

416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2007). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

(C) *Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of

Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

4

determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since August 7, 1997, his alleged onset date. (Tr. at 19, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from residuals from a back injury with nerve damage to back and legs, and asthma, which were severe impairments. (Tr. at 20, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 27, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity for light exertional work as follows:

> [T]hrough the date last insured, the claimant had the residual functional capacity to perform light work requiring lifting up to twenty pounds occasionally and ten pounds frequently, standing and/or walking up to six hours in an eight-hour workday, sitting up to six hours in an eight-hour workday, occasionally performing pushing and/or pulling including operation of hand and/or foot controls, occasionally performing postural activities including climbing, balancing, stooping, kneeling, crouching, and crawling, with no manipulative limitations other than limited feeling, and no visual or communicative limitations other than should avoid concentrated exposure to extreme

5

cold, vibrations and fumes, odors, dusts, gases, poor ventilation and other respiratory irritants, and working in hazardous conditions including moving machinery and at heights.

(Tr. at 28, Finding No. 5.) At step four, the ALJ found that Claimant could perform his past relevant work through the date last insured, December 31, 2002. (Tr. at 34, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ further concluded that through the date last insured, Claimant could perform alternative work as a fashion photographer working with fashion models, at the light level of exertion. (Tr. at 34, Finding No. 8.) On this basis, benefits were denied. (Tr. at 35, Finding No. 9.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

6

Claimant's Background

Claimant was born on October 7, 1969, and was 37 years old at the time of the administrative hearing, March 7, 2007.[3] (Tr. at 145, 670, 672, 690.) Claimant had a high school education and took some college level courses. (Tr. at 34, 187, 670, 673-74, 690.) In the past, he worked as a steel documentation specialist. (Tr. at 34, 178-80, 674, 691.)

The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.

Claimant's Challenges to the Commissioner's Decision

Claimant first alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in failing to find that his mental impairments were severe at step two of the sequential analysis. (Document No. 13 at 6-7.) Claimant asserts that the ALJ's finding that his depressive, anxiety, and personality disorders did not restrict his activities of daily living and ability for social functioning, concentration, persistence, or pace is in direct contradiction to the opinion of Dr. Philip Robertson, M.D., Claimant's evaluating psychiatrist. (Id. at 6.) In addition to Dr. Robertson's findings, Claimant asserts that his active psychiatric treatment and counseling, as well as his past in-patient psychiatric admission, support a finding that his mental impairments were severe. (Id.) Claimant contends that the ALJ "committed reversible error by improperly injecting his own medical opinion concerning the seriousness of the [C]laimant's impairment as a basis for concluding

_____

[3] The undersigned notes that the ALJ noted that Claimant was "[b]orn on February 16, 1956, the claimant is currently 48 years old. This is defined in the regulations as a younger individual." (Tr. at 34.) This appears to be a typographical error, as the ALJ noted throughout the administrative hearing that Claimant was 37 years old. Furthermore, the ALJ considered Claimant as a younger individual in any event, and therefore, the Court finds no error in the ALJ's stating Claimant's age incorrectly in his decision.

that the [C]laimant was not disabled." (Id. at 6-7.)

In response to Claimant's argument, the Commissioner asserts that the ALJ properly rejected the opinions of Dr. Robertson because he examined Claimant nearly four years after the expiration of his insured status, and there was no indication that Dr. Robertson's findings related back to the relevant time period prior to the expiration of Claimant's insured status. (Document no. 16 at 19.) The Commissioner further asserts that the ALJ properly rejected Dr. Robertson's opinion for two additional reasons. (Id.) First, the ALJ found that Dr. Robertson's opinion was internally inconsistent as he found Claimant disabled but assessed a GAF score of 60-65.[4] (Id. at 19-20.) Second, the ALJ found that the finding of disability was an opinion reserved to the Commissioner. (Id. at 20.) The Commissioner further asserts that the other substantial evidence of record supported the ALJ's decision. (Id.) Particularly, the Commissioner notes that the ALJ adopted the opinions of Dr. Naveaux and Dr. Todd, and accorded great weight to the opinion of Dr. Rice. (Id.) Accordingly, the Commissioner asserts that the ALJ made no error regarding the evaluation of Claimant's mental impairments. (Id.)

Claimant also alleges that the Commissioner's decision is not supported by substantial evidence because the Veteran's Administration awarded Claimant a 110 percent service connected disability. (Document No. 13 at 7-8.) Claimant asserts that the ALJ ignored "the totality and significance of this information . . . leav[ing] his decision not supported by substantial evidence." (Id. at 7.) He further asserts that the fact that "[o]ne aspect of the government makes a decision that someone is 100% disabled, and yet another arm of the government finds that the [C]laimant is not disabled at all, there

---

[4] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 61-70 indicates that the person has some mild symptoms or "some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994)

leaves much in the way of confusion and contradiction." (Id. at 7-8.)

The Commissioner responds that pursuant to 20 C.F.R. § 404.1504, the ALJ was not bound by the Veteran's Administration's decision that Claimant was disabled. (Document No. 16 at 21.) To the extent that the ALJ was required to consider the Veteran's Administration disability rating, the Commissioner asserts that he acknowledged the same in his decision. (Id.)

Finally, Claimant alleges that the ALJ improperly rejected the opinion of Dr. Clifford H. Carlson, M.D., and accorded greater weight to the opinions of the state agency reviewing physicians. (Document No. 13 at 8-9.) Claimant asserts that "non-examining physicians cannot be given control[ling] weight when there are credible evaluating physicians who have actually performed physical examinations that were contradictory to a medical reviewing physician." (Id. at 9.)

The Commissioner asserts that the ALJ properly rejected the opinion of Dr. Carlson because his examination of Claimant and opinions were rendered nearly four years after the expiration of Claimant's insured status. (Document No. 16 at 21.) The Commissioner further asserts that there is no indication that Dr. Carlson's findings relate back to the relevant time period prior to the expiration of Claimant's insured status. (Id. at 21-22.) Regarding the state agency physicians' opinions, the Commissioner contends that pursuant to 20 C.F.R. § 404.1527(f)(2)(I), the ALJ properly considered their opinions. (Id. at 22.) The Commissioner further asserts that the ALJ gave appropriate weight to the opinion of Dr. Gajendragadkar, a consultative examiner who examined Claimant during the relevant period of time. (Id.)

Analysis.

1. Mental Impairments.

Claimant first alleges that the ALJ erred in not finding that his mental impairments were severe impairments. (Document No. 13 at 6-7.) Specifically, Claimant asserts that the ALJ should have found

his impairments severe based on the opinion of Dr. Robertson. (Id.) To be deemed disabled, a claimant must have an impairment or combination of impairments which is severe, meaning that it "significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c); 416.920(c) (2007). Basic work activities are the abilities and aptitudes necessary to do most jobs, including: physical functions such as sitting and standing; capacities for seeing, hearing and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. Id.; §§ 404.1521(b)(1)-(6); 416.921(b)(1)-(6). Conversely, "[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984) (emphasis in original). An inconsistency between a claimant's allegations about the severity of an impairment and the treatment sought is probative of credibility. See Mickles v. Shalala, 29 F.3d 918, 930 (4th Cir. 1994). As discussed above, the determination whether a claimant has a severe impairment is made at the second step of the sequential analysis.

The evidence of record regarding Claimant's mental impairments establish that on February 19, 1999, Claimant was examined by Dr. Ali A. Amar for evaluation of anxiety and depression. (Tr. at 503-04.) Claimant reported increased stress for the past three years related to his application for disability benefits in relation to his service-related injury. (Tr. at 503.) Claimant further reported that due to his back pain, he felt down and depressed and frequently felt frustrated and angry. (Id.) Dr. Amar noted that Claimant lived with his mother and was trying to learn computer skills. (Id.) Mental status exam revealed that Claimant's speech was spontaneous and relevant, his mood was dysphoric with restricted affect, his memory and recall was fair, and his insight and judgment were intact. (Tr.

10

at 504.) Dr. Amar noted that no thought disorder, delusions, or hallucinations were elicited and that Claimant denied any suicidal or homicidal ideations. (Id.) Dr. Amar diagnosed adjustment disorder secondary to physical and situational factors, rule out depression, and a GAF of 60.[5] (Id.) He recommended counseling. (Id.)

Claimant, accompanied by his mother, attended counseling on February 26 and March 19, 1999. (Tr. at 501-02.) On February 26, 1999, Claimant complained of worrying a lot and reported feelings of depression. (Tr. at 502.) He reported that he intended to pursue correspondence courses. (Id.) The social worker counseling Claimant assessed a GAF score of 70. (Id.) On March 19, Claimant reported that he had no problems with depression and his thoughts that "things will be better when he moves out of his home and begins living with his fiancee." (Tr. at 501.) The social worker noted that Claimant's mood was somewhat irritable when seen with his mother, but otherwise euthymic with an appropriate affect. (Id.) The social worker assessed a GAF score of 75.[6] (Id.) Claimant reported that he did not need further counseling. (Id.)

On May 6, 1999, Dr. Ahmed Faheem, M.D., conducted an examination of Claimant regarding his claim for increased veteran's benefits. (Tr. at 575-76.) Claimant reported that he was depressed, had hopeless and helpless feelings, felt tired and run-down, experienced difficulty in concentrating and handling stressors, and felt bad because of his physical impairments. (Tr. at 575.)  He stated that he

---

[5] A GAF of 51-60 indicates that the person has moderate symptoms, or moderate difficulty in social, occupational or school functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

[6] A GAF of 71-80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

avoided people and stayed much to himself. (Id.) Claimant reported his daily activities to include performing personal care, operating a ham radio, attending church occasionally, and watching television. (Id.) On mental status exam, Dr. Faheem noted that Claimant was oriented, that his attention and concentration were impaired, that his recent memory was slightly impaired, his judgment was intact, and his thoughts and fund of knowledge were appropriate. (Id.) Dr. Faheem diagnosed depressive disorder NOS and assessed a GAF score of 65. (Tr. at 575-76.) He opined that Claimant's "psychiatric problems are secondary and within themselves are not disabling." (Tr. at 576.)

On September 13, 1999, Dale M. Rice, M.A., conducted a mental status examination. (Tr. at 520-26.) Claimant reported that he felt down and frustrated, but identified no other symptoms. (Tr. at 521.) On mental status exam, Mr. Rice noted that Claimant had a good attitude, was cooperative, maintained good eye contact, was appropriate and related fairly well, and was alert and fully oriented. (Tr. at 523.) His mood was dysphoric, his affect was mildly restricted, insight was fair, judgment was average, thought processes were logical and coherent, speech production was good with normal rate and volume, and there was no indication of delusions, obsessive thoughts, or compulsive behaviors. (Id.) Claimant denied suicidal and homicidal ideation, his memory was intact, and concentration and psychomotor behavior were within normal limits. (Tr. at 523-24.) Intellectual testing revealed a verbal IQ of 99, a performance IQ of 95, and a full scale IQ of 98. (Tr. at 524.) Mr. Rice diagnosed adjustment disorder with depressed mood, chronic, and noted that his prognosis was fair. (Tr. at 525.) Mr. Rice indicated that Claimant's social functioning was fairly good, and that his concentration, persistence, and pace were within normal limits. (Tr. at 526.) He noted Claimant's daily activities to include working on his computer, listening to the radio, and watching television. (Id.) On a weekly basis he went shopping and on a monthly basis, paid bills. (Id.) Claimant also reported his hobbies and interests to include computers and a ham radio. (Id.)

Dr. LaRee Naveaeux, Ph.D., a state agency psychologist, completed a form Psychiatric Review Technique on September 24, 1999. (Tr. at 527-35.) Dr. Naveaeux opined that Claimant's adjustment disorder was not a severe impairment and resulted in only slight limitations in activities of daily living and maintaining social functioning. (Tr. at 527, 530, 534.) Dr. Naveaeux noted that Claimant's mental impairment neither functionally limited his persistence, concentration, or pace, nor resulted in episodes of decompensation. (Tr. at 534.)

Claimant was examined by Dr. Ramesh C. Shah, M.D., on March 2, 2000. (Tr. at 552-53.) Claimant reported that he was depressed, that his sleep was disturbed, that he was anxious and nervous, and that he had frequent arguments with his mother. (Tr. at 552.) He indicated that during his arguments with his mother, he threatened to harm himself, but admitted that he would never kill himself. (Id.) Claimant further reported that he was taking correspondence courses in computer technology at home and talked on the radio. (Id.) Dr. Shah diagnosed dysthymic disorder, generalized anxiety disorder, a relationship problem with his mother, and assessed a GAF of 55. (Tr. at 553.) On April 20, 2000, Claimant reported to Dr. Shah that he had become much more depressed, had thoughts of suicide, and had problems with his fiancee and mother. (Tr. at 621.) Dr. Shah opined that Claimant had become "so depressed and anxious that his attentional and concentrational abilities are severely impaired." (Id.) He further opined that Claimant seemed "to be totally disabled for substantial gainful employment for a period of 12 months from today and has been for the last 12 months." (Id.)

Due to Claimant's strong suicidal thoughts and his unpredictability, Dr. Shah had Claimant hospitalized. (Tr. at 320-21, 621.) Claimant reported having had depressive symptoms since 1995 and that he had taken anti-depressant medication prescribed by Dr. Shah for six weeks with little benefit. (Tr. at 320.) During his hospital stay, Claimant's medications were changed and his sleep improved significantly. (Tr. at 321.) It was noted that his mood and affect "were very bright towards the end of

13

the hospital stay." (Id.) On discharge, Claimant was diagnosed with major depressive episode and a history of dysthymia. (Tr. at 320.)

On May 19, 2000, Claimant reported to Richard Janney, PA-C, that his relationship issues were resolving and that he had accepted the fact that his girlfriend could not be trusted. (Tr. at 625.) On exam, his mood was mildly dysphoric, his affect was normal, his eye contact was fair, and his speech was clear, relevant, and goal directed. (Id.) He was not suicidal or homicidal. (Id.) Mr. Janney diagnosed depression, recurrent; history of dysthymia; and assessed a GAF score of 60. (Id.) On May 22, 2000, Claimant reported to a social worker that he wanted to move on with his life and that he was "doing okay." (Tr. at 626.) He went to his brother's wedding and enjoyed it. (Id.) It was noted that Claimant's mood was improved and that he no longer felt depressed. (Id.) On June 22, 2000, Claimant again reported that "everything is going well. I'm feeling pretty good. I don't have any problems at this time. I'm still working on my computer course." (Tr. at 630.) Nevertheless, Dr. Shah noted that Claimant looked a bit depressed and anxious, but noted that he was not dangerous to himself or to anyone else. (Tr. at 631.)

On August 3, 2000, Claimant reported that "I'm doing okay. I'm still working on my computer course." (Tr. at 633.) He denied any suicidal ideation and reported that he took his medication daily. (Id.) Dr. Shah noted his reports that he was not depressed but was somewhat anxious and frustrated. (Tr. at 634.) Dr. Shah assessed a GAF score of 70. (Id.) On September 21, 2000, Claimant and his mother visited Dr. Shah. (Tr. at 638.) Claimant reported that he became irritated easily, that he felt people were against him for no reason at all, that he felt very paranoid and mildly delusional at times, and that he was somewhat depressed and more anxious. (Id.) Dr. Shah diagnosed major depression, recurrent with mild psychotic features; generalized anxiety disorder; personality disorder nonspecific; and assessed a GAF score of 55. (Id.) Dr. Shah adjusted Claimant's medications. (Id.) On September

14

25, 2000, Claimant reported to the social worker that he was having mood swings. (Tr. at 639.) The social worker noted that Claimant's mood was slightly dysphoric with a restricted affect, but noted that he was not suicidal. (Id.)

On November 9, 2000, Dr. Shah completed a form at the request of Claimant's attorney, on which he indicated that Claimant "seems to be totally disabled for substantial gainful employment and has been for the last 12 months. He is an unfit candidate for vocational rehabilitation." (Tr. at 642.)

On November 19, 2001, Dr. Eric J. Christopher, M.D., at the Durham VAMC noted on examination that Claimant was "very anxious and somewhat depressed." (Tr. at 338.) On March 11, 2002, Dr. Christopher noted Claimant's reports of no real change in his mood and that he failed to take his medications. (Tr. at 333-34.) Dr. Christopher noted that Claimant's mood was "not too good," but that his affect was full and appropriate and that his insight and judgment were fair to poor. (Tr. at 334.) Dr. Christopher instructed Claimant to take his medication and Claimant seemed willing to try to take the medication. (Tr. at 334-35.)

On July 4, 2006, Dr. John Todd, Ph.D., a licensed psychologist, completed a form Psychiatric Review Technique, on which he opined that prior to December 31, 2002, Claimant's major depressive disorder and pain disorder were non-severe impairments, resulting in only mild limitations of activities of daily living, social functioning, concentration, persistence, or pace, and no episodes of decompensation. (Tr. at 422-35.)

At the request of Claimant's attorney, Dr. Philip B. Robertson, M.D., conducted a psychiatric evaluation of Claimant on October 23, 2006. (Tr. at 448-51.) Mental status examination revealed normal psychomotor activity, with a calm, composed demeanor. (Tr. at 450.) Dr. Robertson noted that Claimant was subdued and non-engaging, but maintained eye contact. (Id.) His mood was mildly to moderately depressed with a stable affect of subdued intensity, constricted range with little reactivity.

(Id.) Claimant's concentration was fair, his intellectual functioning was average, and thought process was coherent, logical, and goal directed. (Id.) Claimant reported no suicidal thoughts, and Dr. Robertson noted that he demonstrated superficial insight. (Id.) Abstract ability was limited and the Beck Depression Inventory-II placed him in the upper limit of mild depression. (Id.) Dr. Robertson diagnosed dysthymic disorder, chronic, moderate severity; history of major depressive disorder, recurrent episodes, at times with mild psychotic features; anxiety disorder NOS; pain disorder NOS; possible psychological factors affecting medical condition; personality disorder NOS with dependent features; and assessed a then current GAF score of 60-65. (Id.) He opined that Claimant was "rendered temporarily, totally disabled for greater than twelve months by the combination of his physical, medical and psychiatric impairments." (Tr. at 451.) Dr. Robertson further noted that Claimant would not benefit from vocational rehabilitation services. (Id.)

On November 14, 2006, Dr. Robertson completed a form Mental Impairment Questionnaire on which he opined that Claimant's mental abilities in the following areas did not meet competitive standards: complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, deal with normal work stress, and deal with work stress of semiskilled and skilled work. (Tr. at 453-55.) He opined that Claimant's following abilities were seriously limited, but not precluded: maintain attention for two hour segments and maintain regular attendance and be punctual within customary, usually strict tolerances. (Tr. at 453-54.) Finally, Dr. Robertson opined that Claimant's following abilities were limited, but satisfactory: remember work-like procedures, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being unduly distracted, make simple work-related decisions, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or

16

exhibiting behavioral extremes, respond appropriately to changes in a routine work setting, interact appropriately with the general public, set realistic goals or make plans independently of others, and understand, remember, and carry out detailed instructions. (Tr. at 453-55.) Dr. Robertson assessed moderate limitations in maintaining social functioning and marked limitations in concentration, persistence, or pace. (Tr. at 456.) He noted that Claimant's mental impairments would result in him missing more than four days of work per month and that his impairments were expected to last at least twelve months. (Tr. at 457.)

In his decision, the ALJ determined that Claimant's depression, anxiety disorder, and personality disorder did not restrict his activities of daily living, his ability for social functioning, concentration, persistence, or pace, or result in episodes of decompensation of extended duration. (Tr. at 20.) Consequently, pursuant to 20 C.F.R. § 404.1520a(d)(1), the ALJ determined that Claimant's mental impairments were not severe. (Id.) In reaching this conclusion, the ALJ summarized the evidence of record, including the opinion evidence, and determined that the opinion of Dr. Naveaeux, a state agency reviewing physician, was entitled controlling weight because it was supported by medically acceptable clinical techniques and was not inconsistent with the other substantial evidence of record. (Tr. at 32.) The ALJ noted that prior to December 31, 2002, Claimant's date last insured, Claimant reported having taken classes and was assessed with GAF scores of 70, representing only mild symptoms. (Id.) Even after his insured status expired, the ALJ noted that Claimant traveled to and from North Carolina to visit and care for his ill brother and that he was not taking his prescribed medications. (Id.) Claimant further indicated that he attended activities associated with his church. (Id.)

The ALJ gave great weight to the opinion of Dr. Rice because it was given within the period of time prior ro the expiration of Claimant's insured status and was based on objective testing and a clinical evaluation of Claimant's social functioning. (Tr. at 33.) The ALJ declined to adopt the opinion

17

of Dr. Robertson for several reasons. (Id.) First, the opinion was rendered after the expiration of Claimant's insured status and there was no reference to exclusivity prior to that date; there was no indication that his opinion related back to prior to the date last insured. (Id.) Second, Dr. Robertson's opinion was on an issue reserved to the Commissioner. (Id.) Finally, the ALJ found that Dr. Robertson's evaluation of specific limitations conflicted with the records of his treating physicians prior to the date last insured and conflicted with Claimant's reported activities of daily living. (Id.) Thus, the ALJ found that Dr. Robertson's opinion that Claimant was disabled was "totally inconsistent" with his specified activities, which included attending church, watching television, driving, walking, taking a Bible correspondence course by home computer, visiting a great aunt, talking on a ham radio, and enjoying photography. (Tr. at 32.)

The Court finds that the ALJ's decision to not adopt the opinion of Dr. Robertson is supported by substantial evidence. The Court first notes that, as the ALJ explained, an opinion on disability is an issue reserved to the Commissioner. See 20 C.F.R. § 404.1527(e)(1) (2007). Second, the Court notes that pursuant to 20 C.F.R. § 404.1527(f)(2)(I), the ALJ was entitled to rely on the opinions of the qualified state agency physicians, Drs. Naveaeux and Todd, whose opinions were supported by the substantial evidence of record, including Claimant's treatment notes at the VAMC. Finally, the Court notes that Dr. Robertson's opinion, as the ALJ found, was rendered nearly four years after Claimant's insured status expired and did not indicate that Claimant's condition at the time of the opinion related to his condition prior to the date last insured. Accordingly, the Court finds that the ALJ's decision that Claimant's mental impairments were not severe and that Dr. Robertson's opinion was not entitled controlling weight is supported by substantial evidence of record, as summarized above.

2. Veteran's Administration Finding of Disability.

Claimant next alleges that the ALJ's decision is not supported by substantial evidence because

Claimant is receiving a 110 percent service connected disability from the Veteran's Administration. (Document No. 13 at 7-8.) Title 20, C.F.R. § 404.1504 provides:

> A decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind. We must make a disability or blindness determination based on social security law. Therefore, a determination made by another agency that you are disabled or blind is not binding on us.

See also, DeLoatche v. Heckler, 715 F.2d 148, 150 n.1 (4th Cir. 1983); Dobbins v. Astrue, Civil Action No. 5:07-00333, 2008 WL 4282717, at *8 (S.D. W.Va. Sept. 17, 2008). The ALJ noted the Veteran's Administration's disability ratings and awards in his decision, and therefore, properly considered the same in finding Claimant not disabled. (Tr. at 20-21.) Accordingly, the Court finds that the ALJ did not err in failing to find Claimant disabled solely based upon the 110 percent disability awarded by the Veteran's Administration.

3. Opinion Evidence.

Finally, Claimant alleges that the ALJ erred in rejecting the opinions of Dr. Carlson and according greater weight to the opinions of the state agency reviewing physicians. (Document No. 13 at 8-9.) At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2007). "This assessment of your remaining

capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

See 20 C.F.R. § 416.927(e)(2) (2007).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do.  That is, the SSA need not accept only physicians' opinions.  In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and 416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner. . . ." Id. §§ 404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the

Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests with the Administrative Law Judge or Appeals Council." See 20 C.F.R. §§ 404.1545 and 416.946 (2007). However, the adjudicator must still apply the applicable factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources on issues reserved to the Commissioner. See Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical source statement,' which is a 'statement about what you can still do despite your impairment(s)' made by an individual's medical source and based on that source's own medical findings." Id. SSR 96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s)." Adjudicators "must weigh medical source statements under the rules set out in 20 C.F.R. § 416.927, providing appropriate explanations for accepting or rejecting such opinions." Id. at 34474.

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2007). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

21

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2007). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2007). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Cater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2007). The

22

opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2007). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

The medical evidence reveals that on January 12, 2007, Dr. Clifford H. Carlson, M.D., a board certified psychiatrist, examined Claimant at the request of his attorney. (Tr. at 469-79.) Dr. Carlson evaluated Claimant's mental and physical impairments and concluded that Claimant was "permanently and totally disabled." (Tr. at 479.) He noted that Claimant suffered severe and permanent injuries when he landed on a concrete area after parachuting. (Id.) He noted that Claimant suffered compression fractures of the lumbar spine, had chronic lumbosacral spine sprain/strain syndrome with aggravation of degenerative disease, suffered injury to both knees, had patellofemoral syndrome of the left knee, suffered injury to the left hip with traumatic arthritis, and had a previous injury with partial paralysis of his right thumb. (Id.) He also noted that Claimant had exercise induced asthma, a history of depression, and chronic dysthymic disorder. (Id.)

Dr. Carlson also completed a form Medical Opinion Re: Ability to Do Work-Related Activities (Physical), on which he opined that Claimant was disabled. (Tr. at 481-83.) Specifically, Dr. Carlson noted that Claimant could lift no more than 20 pounds occasionally and ten pounds

23

frequently; could stand and walk less than two hours in an eight-hour workday; could sit about two hours in an eight-hour workday; could stand only ten minutes before changing position; must walk around every ten minutes for five minutes; and that Claimant would need to lie down at unpredictable intervals during a workshift. (Tr. at 481-82.) He further opined that Claimant could occasionally twist, stoop, crouch, and climb stairs, but could never climb ladders. (Tr. at 482.) He also opined that Claimant's ability to reach in all directions and push/pull were limited and that he should avoid all exposure to temperature extremes, wetness, humidity, and hazards. (Tr. at 483.) Dr. Carlson noted that Claimant's impairments would cause him to miss about three days of work each month. (Id.)

The ALJ noted that Dr. Carlson's opinion was based on a one-time consultative examination and was not based on ongoing treatment records or response to treatment. (Tr. at 33.) The ALJ concluded that Dr. Carlson's evaluation of Claimant's functional limitations conflicted with the records of Claimant's treating physicians and Claimant's reported activities. (Id.) Furthermore, the ALJ noted that the opinion was rendered after the expiration of Claimant's insured status and that there was no reference to exclusivity prior to that date. (Id.) The ALJ therefore, assumed that Dr. Carlson's opinion was "a current opinion as to his current status, and not relevant to the restricted, specific time period at issue." (Id.) Thus, the ALJ concluded that Dr. Carlson's opinion did not establish disability prior to the expiration of Claimant's insured status on December 31, 2002. (Tr. at 33-34.) For the similar reasons discussed above regarding the timing of Dr. Robertson's opinion, the Court, too, finds that the ALJ's decision to reject Dr. Carlson's opinion is supported by substantial evidence. There is no indication that his opinion was intended to relate back to the period prior to the expiration of Claimant's insured status.

The ALJ adopted the opinions of the state agency reviewing physicians, Drs. Egnor and

Gajendragadkar, who opined that Claimant was capable of performing work at the light exertional level with limitations comparable to those established by the ALJ in his RFC assessment. (Tr. at 32, 536-41, 542-49.) These opinions were consistent with the treatment notes of record, and were rendered prior to the expiration of Claimant's insured status. Accordingly, the Court finds that the ALJ accorded appropriate weight to these opinions and that his decision to reject the opinion of Dr. Carlson is supported by substantial evidence of record.

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Summary Judgment (Document No. 11.) is **DENIED**, Defendant's Motion for Judgment on the Pleadings (Document No. 16.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to send a copy of this Memorandum Opinion to counsel of record.

ENTER: March 30, 2010.

R. Clarke VanDervort
United States Magistrate Judge